Opinion delivered May 19, 1886.

AUSTIN TERM, 1886.

No. 4099.

JEFF McKISSICK ALIAS JEFF COLEMAN v. THE STATE.

1. PRACTICE—NEW TRIAL.—One of the statutory grounds upon which a new trial shall be granted is "where the jury, after having retired to deliberate upon a case, have received other testimony," etc. (Code Crim. Proc., art. 777.)

2. SAME—IMPEACHING TESTIMONY.—The rule which accords the defendant the right to be confronted with the witnesses against him can not be limited to the witnesses who testify as to facts in issue, but is equally applicable as to witnesses by whom it is sought to impeach the witnesses introduced by the defense. See this case in illustration.

APPEAL from the District Court of Falls. Tried below before the Hon. Eugene Williams.

The conviction in this case was for the theft of a gelding, and the penalty assessed was a term of five years in the penitentiary.

W. D. Barton testified, for the State, in substance, that the horse mentioned in the indictment was the property of his aged mother, who lived with him at the time of the theft, but that it was in his possession and under his control. Besides this horse his mother owned seven others, four of which were broken work horses. It was the custom of the witness to get up and attend to his mother's horses whenever they needed attention. The witness last saw the horse described in the indictment, prior to the alleged theft, in a pasture near Marlin, in the spring of

43

1884, on which occasion he took the horse home, branded him, and turned him on the range. He heard of the horse being on the Big creek range during the same year. On or about the twenty-second day of August, 1885, the witness, being in Waco, learned that a party was recently seen riding the horse towards Waco over the Rock Dam road. In company with Deputy Sheriff Barlow and Mr. Lem Hutchins, the witness went in pursuit of the party. At a point on the said road about ten miles from Waco, and about three miles from Rock Dam, he overtook a man in possession of the horse, which man gave his name as Guinn. The deputy sheriff took charge of Guinn, and the witness took the horse home. Witness had never consented to the taking of said horse by anybody. Mr. George Cousins told the witness, in the spring of 1885, that the said horse, at that time, was on the range on Flat creek, near Marlin. Witness never had the horse in his manual possession but once, and that was in the spring of 1884, when he branded him. He was released upon the range, after branding, unbroken and unaltered. When recovered in August, 1885, the horse was broken and altered.

John T. Barlow testified, for the State, substantially as did the witness Barton with regard to the pursuit and arrest of Guinn, and the recovery of the horse described in the indictment; and in addition that, at the present term of court, the said Guinn pleaded guilty to the theft of another horse from a different party, which horse the witness found at the house of the defendant in Limestone county. The Barton horse was an iron gray animal, branded SB on the hip and shoulder.

Lem Wiggins testified, for the State, in substance that, on the day before the arrest of Guinn for the theft of the Barton horse, the defendant came to his house riding an iron gray horse which he offered to sell to witness. Witness and defendant then went to Marlin together, defendant riding the said gray horse. Going home on that evening, the witness fell in with the man Guinn, who was then riding the gray horse which defendant rode to Marlin on that morning. Guinn passed that night at witness's house, and was arrested on the next day for the theft of the Barton horse. Witness did not observe nor look for any brands on the horse ridden by defendant and Guinn on the day before the latter's arrest.

G. S. Cousins testified, for the State, that he knew W. D. Barton, and knew the iron gray horse involved in this prosecu

tion. He knew that said horse belonged either to said Barton or his mother. In the spring of 1885 the witness had some mares pastured at a place on Flat creek about one mile north from Marlin. The Barton horse, then a stallion, ran on the neighboring range, and got in the habit of breaking into the pasture wherein witness had his mares confined. In order to protect his mares, the witness, late in May, 1885, castrated the said horse and released him on the range, and looked after him until he disappeared late in June or early in July, 1885; since when the witness had not seen him on the range.

Lem Hutchins testified, for the State, substantially as did the prosecuting witness as to the pursuit and capture of Guinn, and the recovery of the horse, which he identified as the property of W. D. Barton.

L. B. Barton testified, for the State, that on his way to Rock Dam from Marlin, in August, 1885, he met the defendant going towards Marlin, riding an iron gray horse. A handkerchief was tied across the horse's forehead, which led the witness to suppose that the horse was then imperfectly broken—the handkerchief "blind" being a method resorted to by stock men to cover the eyes of unbroken horses while mounting. Witness did not observe what, if any, brand was on the horse. A day or two afterwards the witness learned of the arrest of Guinn for the theft of the Barton horse.

Parnell and Simon testified, for the State, that while in Marlin in August, 1885, they observed a white man and a negro who very much resembled the defendant, in the alley behind Rinkelman's store, engaged in earnest conversation. They appeared to be trading horses.

The State closed.

Austin Hill testified, for the defense, in substance, that in 1885 he and defendant lived on John Barron's farm, in Limestone county. In August, 1885, witness went to the Little Brazos to get a cow which he had sold to Mr. Barron. At the Rocky crossing of the Little Brazos the witness met a negro traveling from the direction of Marlin. The negro was riding a brown mare followed by a shaggy brown colt, and was leading an iron gray horse branded SB on the left shoulder and hip. The negro first offered to trade the gray horse, and then the mare and colt, for the horse witness was riding, but witness declined to trade, as he did not own the horse he was then riding. Witness afterwards got the mare and colt in Limestone county for Berry

Cotton. On the morning after he saw the negro in possession of the gray SB horse, the witness saw the defendant in posses-sion of the same horse, going in the direction of the Brazos river. He had some conversation with defendant, but said nothing to him about the horse, as he presumed that defendant had traded with the negro for him. Witness knew that for some time before, and up to the day before he saw the defendant riding the gray horse, as stated, the defendant owned a sorrel pony. He had never seen the sorrel pony since.

Jesse Hunnicutt, the witness whose character (as shown by the affidavit supporting the motion for new trial) was impeached by the foreman of the jury after the retirement of the jury, upon which action the ruling of this court is based, testified, in substance, that in August, 1885, on the main road and about three miles from the Little Brazos, he saw a negro riding a brown mare followed by a shaggy colt, and leading an iron gray horse branded SB on the left shoulder and hip. He observed the brand because it was the brand he had been informed was given by the prosecuting witness. Mr. Bell's brand was SB, but the character and impression of the letters were different from Barton's. The negro was going from the direction of Mar-lin towards Kosse and Groesbeck. On the next day the wit-ness saw the defendant traveling the same road, going towards Marlin, and riding the identical iron gray horse which on the day before the witness saw in the possession of the unknown negro.

The defense closed.

Ike Courtney testified, for the State in rebuttal, that defend-ant at one time lived in the Rock Dam neighborhood on the Brazos river, in which neighborhood the witness lived. The defendant moved away from that neighborhood several years prior to this alleged offense, but visited it at intervals. He came to witness's house in August, 1885, riding an iron gray horse branded SB on hip and shoulder. He remained in the neigh-borhood four or five days, keeping the horse in witness's lot, and riding him openly about the country. He offered to sell the animal to witness, but witness declined to buy. Witness asked defendant if the SB brand on the horse was not the brand of Press Bell, and he replied that it was not. Witness then asked him where he got the horse, and he replied that he got him "in Blue Ridge." Witness did not know where the defendant then lived, but understood that he lived in Limestone county.

*Martin & Dickenson,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. It is shown by the affidavit of a juryman who tried the case that after the jury had retired to consider of their finding one of the jurors (the foreman) stated to the jury that he knew one of defendant's witnesses who testified in the case, and that the said defendant's witness's character was bad and that he was unworthy of belief, and affiant stated that his verdict was materially affected thereby. This witness, who was thus being impeached by the foreman of the jury, was one of if not the most important witness for defendant.

One of the grounds expressly enumerated in the statute as being sufficient to entitle a defendant to a new trial is, "where the jury, after having retired to deliberate upon a case, have received other testimony," etc. (Code Crim. Proc., art. 777, sub div. 7.)

With regard to the impeachment of a witness the same rule obtains as in all other cases; the defendant should be confronted with the impeaching witnesses, and be afforded an opportunity to cross examine them. When the right is not accorded him, the law presumes that he is injured, and will not permit a verdict to stand where such testimony has been used against him in the jury room, and where the circumstances have not been explained, nor attempted to be explained, by counter affidavits supporting the integrity of the verdict; which was the case in this instance.

The same irregularity as presented in this record was held reversible error in the case of Wharton v. The State, 46 Texas, 2, and in Anschicks v. The State, 6 Texas Court of Appeals, 524. The court should have sustained the motion for a new trial upon the ground of the motion, and because of error in overruling said motion, the judgment is reversed and the cause remanded.

*Reversed and remanded.*